## ESTATE OF H. M. WHITMORE.

### No. 3750—Dec. 6, 1875.

CLAIM, ALLOWANCE OF.—*When res adjudicata.*—FACTS SHOWING THAT THERE HAS BEEN NO absolute adjudication UPON a claim.

A claim for indebtedness to be paid out of the estate only when certain primary sources of payment had been exhausted was conditionally allowed by one of two executors (the other being absent from the State) but not by the Probate Judge, until after the settlement of first annual account, wherein the facts of such allowance were recited. Another annual account was settled, in which nothing appears touching the claim; and also a hearing of an application to sell real estate, which was granted, (there being indebtedness, even excluding the claim, to warrant such sale); and in the order, the right was reserved to the heirs to contest the claim.

HELD, on application by heirs in that behalf, that none of the proceedings recited above were a bar to their contesting the claim.

Construing sections, C. C. P., 1636, 1657, 1647.

### July 14, 1876.

CONTRACT TO CUT TIMBER FROM PUBLIC LAND, the title to which is pending in the U. S. Courts, the Commission having confirmed title to the claimants, under a grant, which confirmation has been reversed in the District Court, and an appeal therefrom taken, but subsequently dismissed.

SUCH CONTRACT HELD TO BE LEGAL and a claim thereunder allowable.

INTERPRETATION OF CLAUSES IN CONTRACT fixing the period for which the duties of each party thereunder are to continue.

Construing sections, C. C. P., 1493, 1650; U. S. statutes, p. 1049, Sec. 5388.

*Cowles & Drown,* for executors.

*Douthitt & McGraw,* for devisees.

*G. A. Nourse, J. B. Southard,* for creditor.

Letters testamentary were granted to E. F. Northam and E. P. Whitmore, and they respectively qualified and received letters, viz: Northam April 5, 1870, and Whitmore May 11, 1870, which letters still remain in force.

Notice to creditors was given by Northam, the first publication being April 18, 1870.

February 16, 1871, L. E. White presented to executor Whitmore his claim of $31,806.00 and accruing interest, and thereafter said Whitmore endorsed his allowance thereon in the following words, viz:

" The within and foregoing claim presented on the 16th day of February, A. D. 1871, is hereby approved and allowed for whatever balance of the amount thereof ($31,806.00) may remain due, after the exhaustion by said claimant and the other creditors of the 'Garcia Flume and Mill Company,' and of the firm of Whitmore & Stevens, of the partnership assets of said company and said firm, and after the application to said claim of whatever *pro rata* of said partnership assets may be coming to the same on the settlement of the affairs of said company or firm, and the distribution of the assets thereof.   San Francisco, February 27, 1871.

" E. P. Whitmore,

" Executor of the estate of H. M. Whitmore, deceased."

The allowance was approved by the Probate Judge Aug. 21, 1871, and the claim filed by the Clerk the same day.

July 24, 1871, executor Northam filed a report and account, called "First annual account and report," executor Whitmore being then absent from the State.   Accompanying the account was a list of claims allowed; the reference to the claim of L. E. White being in the following words:

"The claim of L. E. White is allowed by E. P. Whitmore, executor, for the amount that may remain due thereon after the exhaustion of the partnership assets of the Garcia Flume and Mill Co., but not yet approved by the Probate Judge."

After due notice by posting, the account was settled Aug. 14, 1871, on which day a decree of settlement was made. No person appeared except the executor, there was no contest, and the decree does not, in terms in any way refer to the claim of White.

It will be observed that this settlement was *before* the claim had been approved by the Probate Judge.

April 8, 1874, both executors filed their report and account, called "Second annual account of Executors."   Accompanying this account was a list of claims not included in the previous report; no reference is made to the claim of White.   This account was settled April 27, 1874, after notice by posting.   Wm. Royal, attorney appointed by the

Court to represent certain absentees, consented to the settlement of the account.

December 21, 1874, the executors presented a petition for the sale of real estate; and in giving lists of debts of the estate, under the head of "Contingent, Doubtful, and Litigated Debts, &c.," the executors refer to the claim of White as follows: "The claim of L. E. White, assignee of judgment recovered in the 7th District Court (Mendocino Co.) in the action C. P. Clark *et al. vs.* Russel Stevens, was allowed by E. P. Whitmore, one of the undersigned executors, for whatever balance of the amount," &c., quoting the words of the allowance above given, and adding:

"The amount of the said claim was $31,806. This claim was filed in said Probate Court August 20, 1871. The total amount of said claim remains unpaid after the exhaustion of said assets referred to in said allowance."

The petition for sale came in for hearing January 20, 1875; the executors appeared in person and by attorney; Edwin P. Whitmore, Hamlin Whitmore, and Henry S. Whitmore, heirs and devisees of said deceased, Maria H. Whitmore, widow of Joseph F. Whitmore, a deceased heir and devisee of said H. M. Whitmore deceased, Lucia E. Whitmore and Mary J. King, the children of said Joseph F. Whitmore, and Osman L. King, husband of said Mary J. King, all appearing herein by their counsel, Messrs. Douthitt & McGraw, and filing their petition herein, representing that they do not contest said application for sale, but, on the contrary, assent to such sale for the purpose of paying all allowed claims against said estate except the allowed claim of L. E. White for $31,806, and that it is their intention to contest said claim as fraudulent and illegal, and praying that if it should appear that a sale of the real estate is necessary, the right might be reserved to them to contest said claim of L. E. White, and that they be allowed thirty days from said day in which to file and serve on said White the necessary petition and application for contesting said claim.

The said White appeared in person and by attorney and objected to any order being made giving said heirs and de-

visees time to contest said claim, and objected to their contesting said claim.   It was admitted by all parties that a sale of the real estate was necessary to pay the debts, even if said claim of White were not considered.

After hearing all parties, the Court made a decree directing the sale of the real estate, and ordering, on motion of Messrs. Douthitt & McGraw, on behalf of said persons for whom they appear as counsel as aforesaid, that the right to contest said claim of the said L. E. White be reserved to said persons, and to each of them, and that they have thirty days in which to file and serve on said L. E. White the necessary petition and application for contesting said claim.

Subsequently, the said White moved to strike from said decree the clause giving to said persons time to contest said claim, which motion was overruled by the Court.

February 20, 1875, said heirs and devisees, by Messrs. Douthitt & McGraw, filed their petition for the rejection of said claim of L. E. White, and duly served the same the same day.

April 19, 1875, said L. E. White filed his petition, showing the allowance and approval of his claim as above stated, that it had not been paid, and that the executors had sufficient funds in hand for the purpose, and asking that an order be made for its payment.   An order to show cause was made and served.

April 28, 1875, the executors made answer that they had not paid the claim because the same was contested by the heirs and devisees hereinbefore named.   The said heirs and devisees asked leave to file their answer and intervention, objecting to said claim, praying that the same be disallowed and rejected in whole or in part as should seem just, and alleged as grounds of such rejection certain matters set forth in said answer.

On the 24th of March, 1875, the said executors filed their third annual account, in which they say that the claim of said White has not been paid, "which is contested by the heirs of said deceased."

This account was settled April 6, 1875.   Afterwards, in July, 1875, (the hearing having been postponed from time to

time,) the said petition of L. E. White for the payment of his claim came on to be heard, Messrs. Nourse and Southard appeared for said White; Messrs. Douthitt & McGraw appeared for said heirs and devisees, and A. N. Drown, for the executors.

The claimant moved for an order for the payment of his claim, and referred to the first account and to the claim to show that it is an allowed claim, and to the second account, that there remains nothing of the partnership assets, and to the orders settling the accounts, and the proceedings on the sale of real estate.

The said heirs and devisees then offered to file their objections to the payment.

The said White objected to the filing, on the grounds:

1—The heirs and devisees have had their day to object to the claim and its allowance, first, on the settlement of the first annual account; second, on the application for the sale of real estate; and they are now barred.

2—The petition does not state facts sufficient to show them entitled to any relief.

Attorneys for said claimant agreed that under our statute the settlement of the account was conclusive upon the allowance of this claim; that the claim was then passed upon, necessarily, without any specific objection or adjudication; that even if these heirs could have been heard upon the sale of real estate, they should have made their objection then, and the Court could not give them time.

The matter was argued and submitted and taken under advisement.

By the COURT: The Court is of opinion that the said heirs and devisees are not barred from contesting the said claim and its allowance, for the following reasons:

First—Every claim must be allowed by the executors and approved by the Probate Judge *before* it can be ranked among the acknowledged debts. The approval of the Judge is as much a part of its allowance as is the act of the executors. If the Judge had rejected it, it would not be a debt until suit brought and judgment obtained. At the time that

the first annual account was returned, as well as when settled, this claim had *not* been approved by the Judge.   It had been allowed by one executor, doubtless acting for both, but it was not yet a debt to be ranked as such.   Even if this claim and its allowance became in any sense a finality by the settlement of that account, it became such only to the extent that it had been allowed by the executors.   The heirs and devisees were not called upon to contest the claim until it had been approved by the Judge.   Besides, at the time the first annual account was rendered and when settled, this claim of White was not filed, and there was nothing of record to show the nature of the claim.   The knowledge by E. P. Whitmore of its value would not bind the other heirs and devisees.

The settlement of the second account was not an adjudication upon this claim; the account made no reference to it.

Second—The decree for the sale of real estate was not an adjudication upon the claim.   Upon the hearing of the petition for sale, the heirs and devisees appeared and filed objections to the claim.   They did not oppose the sale; it was admitted by all parties that a sale was necessary, even not considering the claim of White; and such sale being necessary, it was not required to postpone all other proceedings in the estate to await a controversy which would effect only the claimant and the heirs and devisees.

The Court did not assume to then pass upon the claim, but expressly reserved the question, and gave to the devisees and heirs time to bring forward their objections.

Third—The Code in terms gives to heirs and devisees three periods at either of which they may appear and contest an allowed claim, viz:

1—Upon rendering the third term exhibit;

2—Upon the settlement of any account;

3—Upon hearing a petition for sale of real estate.

Sec. 1636 provides that upon the settlement of any account, "all matters, including allowed claims not passed upon on the settlement of any former account, or on rendering an exhibit, or on making a decree of sale, may be con-

tested by the heirs, for cause shown." Sec. 1637 provides that "the settlement of the account and allowance thereof by the Court, or upon appeal, is conclusive against all persons," &c. And Sec. 1647 provides that upon the settlement of the accounts of the executor and administrator at the end of the year, the Court must make an order for the payment of the debts.

It was urged by counsel for White that the heirs and devisees are limited to these periods, and can be heard at no other; and that if a claim be allowed and reported in any account, the heir must then contest the claim, and the settlement of the account is conclusive upon the claim, and the contest can never after be heard. On the other hand, it was urged that a claim is not passed upon merely by the settlement of the account; that the words "*passed upon*" mean actually heard and adjudicated; that unless a claim has been actually *passed upon*, the heirs may object upon the application of the claimant for payment, even though the statute does not mention that as one of the periods for objecting.

Whenever any claimant makes application for the payment of his claim, it must necessarily be that any person whose interests would be effected thereby has the right to contest such payment, unless such right is absolutely barred by statute. Even granting that the settlement of an account is conclusive as to all claims therein reported as allowed, we have seen that this claim was not an approved claim when reported, and could not have then been passed upon as an approved claim. The statute regarding sale of real estate does not in terms make the decree of sale conclusive to the same extent as the decree of settlement of an account; it may be doubted if it be conclusive in any respect other than as to the propriety of a sale.

It is the opinion of the Court that this claim has not been "passed upon" within the meaning of the statute.

The above point, as to the right of the heirs and devisees to be heard, was the principal point urged. The other point, that the petition does not state sufficient facts, was not so thoroughly considered. The claimant can demur

after the objections are filed, and so have that point fully considered.

It is ordered that said heirs and devisees have leave to file their objections to the payment of said claim.

## July 14, 1876.

Proceedings upon motion of L. E. White that his claim be paid:

### FACTS AND CONCLUSIONS.

The heirs at law present reasons why the claim should not be paid, viz:

1—The contract was against the policy of the law, and is void, it being a contract to cut timber upon public land of the United States;

2—Whitmore & Stevens had the right to terminate the contract when they pleased, and were to be in no case responsible for any injury Schwend & Clark might thereafter sustain or expenses they might incur.

1—As to the first point:

### FACTS:

The timber referred to in the contract was growing upon land covered by an alleged Mexican grant. The claim was presented to the Land Commission for confirmation, March 16, 1852, and was confirmed, Nov. 6, 1855. Feb'y 15, 1856, the transcript was filed in the District Court of the U. S., and June 19, 1866, a decree was entered rejecting the claim. Dec. 3, 1867, an order was made granting an appeal to the U. S. Supreme Court. Oct. 4, 1872, motion to vacate decree was dismissed; and Jan. 6, 1873, mandate of Supreme Court filed, dismissing appeal.

The contract was made May 14, 1869, and was to run four years from May 24, 1869; and the timber to be cut was for private purposes, for removal.

The only title which Whitmore & Stevens had to the land bearing the timber was derived by mesne conveyances from the grantees of the above mentioned grant; and other than as affected by the grant, the land was public land of the

United States, Clark & Schwend had no knowledge or information as to the title, other than as furnished by the contract.

CONCLUSIONS.

The Act of Congress of March 2, 1831, Sec. 9, [1 Brightley, 877,] makes it a penal offence to cut timber upon any of the lands of the United States. It is of course a well settled principle of law, that if the contract grows immediately out of, or is connected with an illegal act, courts will not enforce it; but will allow the objection to be made by either party [2 Kent, 466–7], and unless some act, express or implied, upon the part of the Government, would give permission for or justify the use of the land and the cutting of timber, such cutting would be illegal and the contract relating thereto void. The Land Commission was a branch of the Government; the claim of the grantees was presented to the Commission and by it approved. The title to the land did not pass and would not pass except in case of final confirmation; but the confirmation by the Land Commission might remove the act of cutting the timber by the grantees from the effect of the criminal statute. Before the date of the contract the claim had gone to the District Court, and had been by it rejected; but an appeal had been allowed, the effect of which must have been to suspend the effect of the judgment of the District Court.

The whole subject of the validity of the grant was under examination, the Government having in one instance recognized its validity; and there is very grave doubt whether a grantee under such circumstances is liable to criminal prosecution.

The importance of the principle involved will be apparent, in its practical operation, when it is considered that the mining and other industries of the State depend largely upon the use of timber.

If it be true that this contract is void, no contract for cutting or furnishing timber or lumber can be good unless the timber be cut from land the title to which has passed from the Government.

While there may be no doubt as to the fact that the land is public land in this case, the better course appears to be to sustain the contract.

2—As to the second point. The contestants claim that Whitmore & Stevens were by the terms of the contract at liberty to terminate it at any time; that Schwend & Clark were to furnish logs only upon the order of W. & S.; that W. & S. could at any time cease ordering logs, and thereafter they would not be bound to receive any; that the subject of the contract was a mutual venture, and that S. & C. were to take the risk of the success of the enterprise, viz: the condition of the market as to demand for lumber, the same as W. & S.

I find myself unable to agree with them in this. The portions of the contract relating to this point are: S. & C. "agree to supply in such lengths as the parties of the second part [W. & S.] may from time to time order, * * * to keep the mill supplied with logs in sufficient quantities * * * to keep the mill in constant operation in manufacturing of lumber during the term of four years commencing May 24, 1869," and W. & S. agree " to receive from the parties of the first part * * all merchantable logs * * in quantities as the parties of the second part may from time to time require, and manufacture such logs into lumber;" that after May 1, 1870, they will advance not exceeding $15,000 to be used in getting logs to the mill; that they will advance each year if necessary for the purpose of supplying the mill with logs not exceeding $15,000.

Considering these clauses together, I am of opinion that the period of the contract was four years, and that neither party had the right to terminate it sooner. The mill was to be run four years; logs were to be furnished by the one and received by the other for that time; but the number required from time to time to keep the mill in operation, and the kind as to length, was under the direction of W. & S. That seems to be a reasonable construction of a reasonable contract; but it would seem to be a forced construction to hold that at any time after S. & C. had expended $15,000 in constructing the boom and pier, and had 4,000 logs ready

to float to the mill, and 1,300 trees cut and barked (as in this case), W. & S. could at an hour's notice terminate the contract, appropriate the boom and pier, and leave the logs and trees to S. & C. Of course, S. & C. could have made such a contract if they had seen fit to do so; but I do not think they have done so in this case.

3—As to the damages, and the amount to be ordered paid.

FACTS.

The contract (which is the basis of the claim of L. E. White, and is on file as a part of said claim,) is dated May 14, 1869, and was for a period of four years commencing May 24, 1869; under the contract the parties entered upon its performance, and continued nearly fourteen months; the amount of lumber sawed during that time was 6,550,000 feet; and in addition thereto, S. & C. had 4,000 logs ready to float to the mill, and 1,300 trees cut and barked. S. & C. constructed booms and piers as provided for in the contract at the cost of $15,000. The dam was completed by W. & S. about November, 1869. Pending the completion of the dam, S. & C. went up a fork of the river emptying into the river below the mill, and cut logs, and in order to get these logs to the mill, built a railway at an expense of $1,000, and incurred an extra expense of $6,720 in getting the logs to the mill. Whitmore died March 9th, 1870; at the expiration of about fourteen months from May 24, 1869, viz: between July 15th and 31st, 1870, Stevens notified S. & C. that no more logs would be required of them, and thereupon S. &. C. suspended operations. They had already invested large sums in making the necessary outlays for carrying on the work to that time and in providing for future operations. Stevens became a bankrupt, and his assignee cut the 4,000 logs into lumber for his estate; S. & C. also became insolvent.

During the carrying on of the work, W. & S. were in the habit of making payments to S. & C. by drafts upon their agents in San Francisco in favor of the employés and other creditors of S. & C.; and after Whitmore's death Stevens drew drafts to the amount of $18,000 and upwards;

these drafts were never paid, nor were they taken by the payees as payment.

The average cost to S. & C. of cutting and getting logs to the mill under the contract was $3.50 per 1,000 feet of lumber; the expense of getting to the mill the 4,000 logs already cut at the time of the stoppage would have been $700, and the cost of chopping and barking the 1,300 trees was in excess of the item $2,500 stated in the claim, viz: $8,855. These logs and trees, if sawed, would have produced 6,440,-000 feet of lumber.

The amounts stated in the claim and presented for allowance, are:

| | |
|---|---:|
| Cost of railroad, - - - - - - | $1,000 |
| Extra expense of getting logs to mill, - - - | 6,720 |
| Booms and piers, - - - - - - | 15,000 |
| Loss of profits for the 2 years and 10 months, unexpired part of term, - - - - - | 24,000 |
| Cost of the 4,000 logs not used at the time of terminating the contract, - - - - - | 9,500 |
| Cost of cutting and barking 1,300 trees, - - | 2,500 |
| Total, - - - - - - - | $58,720 |

### CONCLUSIONS.

Nothing can be allowed for either of the items, $1,000 and $6,720. By the terms of the contract Schwend & Clark were to commence delivering logs May 24, 1869, while Whitmore & Stevens were not bound to have the dam completed before the end of summer. If these expenses were incurred before the end of summer, they were a part of the contract; S. & C. were to deliver the logs at their own cost. It does not appear what portion of these expenses accrued between the end of summer and the time of completing the dam. Even if this did appear, S. & C. could not charge to W. & S. the cost of the road and extra labor; if the dam had not been finished at the agreed time, they could have stopped supplying logs and charged W. & S. with the profits which would have accrued. They could not go on and incur additional expense. W. & S. were in no event to pay more

than $5.00 per M; and S. & C. could not by building roads, etc., increase the amount to be paid.

Striking out these items, reduces the items for further consideration to $51,000. The claim was allowed as a whole at $31,806; there is nothing to indicate for which particular items the allowance was made; therefore, if the sum of $31,806 can be gathered from any or all of the items properly allowable, (not exceeding, as to any item, the amount stated in the claim) that sum, and no more, can be ordered paid, if the contract be valid.

This Court cannot go beyond the amount allowed by the executor; besides, the claimant has expressly waived all sums in excess of that.

As to the item, $15,000, cost of booms and piers: S. & C. were to construct these at their own cost, which were to be used by them in earning their profits; and as I hereafter find their prospective profits, and allow them therefor, the cost of the booms and piers must be disallowed. Subtract this from the $51,000 leaves $36,000, as stated in the claim, for further consideration.

During the time the mill was run, the amount of lumber sawed, as above stated, was 6,550,000 feet, averaging 503,-846 per month. No objection was made to this rate of speed by either party, during the period of running the mill, and is a fair rate for the following 34 months. This rate would give, for the 34 months, 17,130,000 feet, which, at the rate of $1.50 per 1,000 feet, would give a profit of $25,715. The 4,000 logs were worth at the cost price $3.50 per 1,000 feet, less $700 for floating to mill—$9,100. Therefore, add together the profits of 34 months,  -   $25,715
The cost of the 4,000 logs, less floating,   -   -   9,100
1,300 trees (amount stated in claim),   -   -   -   2,500

Makes a total of  -   -   -   -   -   ·$37,315
damages sustained by Schwend & Clark.

This amount exceeds the amount of the claim as allowed by $5,409. The drafts given by Stevens cannot be allowed as an offset.

I have given the facts and conclusions above, so that, if the appellate Court shall be of opinion that the contract is valid, a proper judgment can be entered, and thus avoid further proceedings. If the contract be valid, the proper amount to be ordered paid to the claimant will be, in the judgment of this Court, the amount of the claim as allowed, viz: $31,806.

It being my opinion that the contract was valid, it follows, that the application of L. E. White for the payment of his claim must be granted, and that $31,806 be ordered paid.

Let a decree be entered accordingly.